# The Diamond Match Company *vs.* The Town of New Haven.

New Haven Co., June T., 1887. Park, C. J., Carpenter, Pardee, Loomis and Beardsley, Js.

The selectmen of the defendant town, under an act of the legislature giving the town authority, straightened and deepened the channel of a river running through the town, to prevent injury to the public health caused by its spreading over adjacent low grounds. They employed a competent engineer to plan and lay out the work, and used reasonable care with reference to making the change effectual for the purpose and avoiding injury to contiguous property. A flood however of extraordinary character afterwards occurred, when the ground was frozen, and the new channel, the raised banks of which prevented overflow, was not sufficient for the volume of water, and it set back upon and injured the property of the plaintiff. Held that the town was not liable.

It was found that the damage would not have been done if the banks of the new channel had not been raised above the level of the adjoining ground, and that this was no part of the plan of the engineer, but was done as the easiest mode of disposing of the soil ; but it further appeared that the work was done under a contract the specifications of which required the earth to be thrown out upon the banks, and that the specifications were prepared by the engineer and the work done under his oversight and to his acceptance. Held that the selectmen were not to be considered negligent in the matter.

The selectmen having employed a competent engineer, the town would not be made liable by his misjudgments.

A flood of so extraordinary a character that a provision for it could not reasonably be required, is not necessarily an unprecedented one, but one that was so unlikely to happen or happened in such unusual circumstances, that it could not have been expected.

[Argued June 9th—decided October 21st, 1887.]

Action for obstructing the flow of a stream by means of which the water was set back upon and injured the property of the plaintiffs ; brought to the Superior Court in New Haven County and tried to the court before *Stoddard, J.* The following facts were found by the court.

A special act passed by the General Assembly in the year 1881 with regard to drainage in the town of New Haven, provided as follows: "The town of New Haven, acting by and through the board of selectmen thereof, is authorized

and empowered, within the limits of said town, to take, acquire, appropriate and hold, for the purposes of drainage and sewerage, and to protect and preserve the public health, at such times and in such manner as the public health in the opinion of said board of selectmen may require, real and personal property, and any and all streams and watercourses, natural and artificial, or any portion thereof, and any rights connected therewith, and may also raise, fill up and drain low grounds, may deepen, clear out, alter and straighten said streams and watercourses, may construct and maintain sewers and other channels for the flow of water, and maintain and establish the bounds of said watercourses, streams, sewers and channels."

In 1881 West River was a stream running into New Haven harbor by a very winding and irregular course, through a tract of low meadow land, varying from five hundred to fifteen hundred feet in width, in the western part of the town of New Haven. It formed the westerly boundary of the city of New Haven, and was crossed and bridged by Whalley avenue, and lower down by Derby avenue, highways of the city and town of New Haven.

The river was subject to annual overflow, and in 1881 the selectmen of the town, upon the complaint of sundry inhabitants that malarial influences were engendered by it, determined, as a sanitary measure for the protection of the public health, to straighten the channel of the river between Whalley avenue, on the north, and Derby avenue, on the south, assuming to act for that purpose under the above act of 1881, and it being contemplated at the time that the city of New Haven would thereafter continue the work of straightening the channel within the city limits southwardly to the harbor.

For the purpose of carrying out the project thus determined upon, the selectmen of the town made an arrangement with the authorities of the city of New Haven, by which the city agreed to pay to the town one half of the expense of the work between the two avenues before mentioned, and also agreed to provide through the city engineer all neces-

sary engineering work, including the plans and specifications for the contemplated work.

In 1882, accordingly, the city engineer made surveys of the whole work contemplated under the agreement, prepared his plan, and submitted the same to the selectmen, with a map exhibiting the proposed changes in the course of the river.

The selectmen, after public hearings for the purpose of considering the proposed plan of work, approved of the same, and in 1882 contracted for the execution of a portion of the work in accordance with the plan and specifications prepared by the city engineer, this portion of the work being the section between Derby avenue and Martin street, which last street is midway between Whalley avenue and Derby avenue.

This portion of the work was completed by the contractor and approved by the selectmen before the remaining section of the work between Martin street and Whalley avenue was put under contract.

In 1884 the selectmen, after a further public hearing for the purpose of considering the proposed plan of straightening the river between Martin street and Whalley avenue, approved of the plan submitted by the city engineer, and in the fall of 1884 contracted for the execution of the work in accordance with such plan and the specifications prepared by the city engineer.

There were three contracts made for the execution of the work. The first of these was with C. W. Blakeslee & Son, made on the 6th of October, 1884. This contract contained the following specification with regard to the embankments : " The material excavated from the new channel shall be deposited on each side of the cut in equal proportions, excepting that enough shall be taken to fill in the ends of the old channel as hereinafter specified. The material deposited on the sides of the new channel shall be made in the form of embankments parallel with the new channel of a uniform height of four feet and as shown on the cross section. No material shall be deposited nearer to the new channel on

either side than six feet." The next contract was made with the same parties for the further deepening and widening of the new channel, in accordance with an amendment of the specifications. And on the 28th of April, 1885, a contract was made with Patrick Dowling, for the further excavating and widening of the new channel and the paving of a part of the banks with boulders. The first contract contained a provision for the oversight of the work by the engineer and for the immediate correction of any imperfect work upon his requirement.

The work was faithfully performed by the contractors in accordance with the amended specifications, and to the acceptance of the engineer, and the selectmen accepted the work and paid for it December 30th, 1884.

The general plan of the straightening of the river necessitated an entirely new channel for it for a distance of several hundred feet below Whalley avenue bridge, and a consequent closing of the old channel in that locality by a bulkhead. In preparing the original specifications for the work at this spot for the contractor the city engineer provided for a narrower but deeper channel than the old channel, and removed an obstructing island, so that the sectional area of the water-passage should not be less than that formerly existing. And in the judgment of the engineer the passage thus provided was amply sufficient to carry off the water coming and to come to that place, as efficiently as it was carried off and discharged by the channel of the river before the change was made. The selectmen, in approving this plan and contracting for its execution, intended to provide such a water-passage, and believed it had been so provided.

Below the Whalley avenue bridge the waters in the time of freshets always overflowed the banks of the river, and there was no other way to dispose of such water except to so overflow the banks and extend over and be ponded upon the low lands, and said plan was adopted and the new channel made upon the theory that the water would continue to overflow the banks of the new channel and cover the low lands.

The new channel thus provided runs at an angle of about thirty degrees deflection from the line of the old course or channel of the stream. The bulkhead across the old channel, and the banks created by the placing of excavated material upon the side of the new channel, operated to dam back the water and cause the damage upon the occasion complained of.

The engineer under whose direction and supervision the work was done, and by whom the contracts and specifications above mentioned were drawn, did not, before the making of the contracts of November 1st and October 6th, 1884, or before the completion of the work specified in those contracts, make any survey or official inspection of the river or of its adjacent territory above the Whalley avenue bridge.

The placing of the material excavated for the new channel upon the banks of the river and thereby raising them did not form any part of the plan designed by the engineer for straightening West River from Martin street to Whalley avenue, but it was deposited upon the sides of the excavated channel, though not to the height mentioned in the specifications, as the easiest and cheapest mode of disposing of the excavated material.

The damage sustained by the plaintiff was caused by an exceptionally heavy rainfall in the early hours of February 10th, 1885, which, with the smooth and hard surface of the ground co-operating, occasioned severe freshets not only in West River but throughout a wide extent of country. It was an extraordinary freshet as compared with the ordinary annual overflows or freshets common to West River. The water overflowed the plaintiffs' premises, and came into their store-houses to such an extent that their goods, wares and merchandise were thereby damaged and destroyed. The damage is assessed at the sum of $922.88.

The water of the river upon this occasion would not have invaded the plaintiffs' premises so as to have caused this damage except for the changes which had been made by the defendant in raising the banks of the river and narrowing

its channel as specified and done under the contract of October 6th, 1884.

The plan of the engineer for the straightening of the channel of the river did not of necessity call for raising its banks and narrowing its channel, as specified in the contracts of October 6th, and November 4th, 1884. The amendments of the original plan, as specified in the contract of the 28th of April, 1885, were equally adequate and adapted to the proper execution of the original plan, and if the material excavated had not been placed in the form of an embankment, and if the waters had been left free to spread over the meadow unobstructed by such substantially continuous embankment, and as they did before the new channel was made, the damage in question would not have been done.

The waters of this river rise rapidly in times of freshet, especially during heavy falls of rain when the ground is frozen. The freshet which occasioned the damage was unusual and extraordinary, but not unprecedented, and had the rise in the river at this time been only the ordinary annual freshet or rise the damage complained of would not have been caused.

In addition to the annual rise and ordinary freshets and overflow the river was subject in occasional years to extraordinary freshets or floods, and such extraordinary freshets and floods ought reasonably to be expected occasionally to occur.

The water-way span of Whalley avenue bridge is one hundred feet, and is ample to take and discharge all water coming in such extraordinary freshets and floods occurring occasionally, and the waters of such freshets could easily, naturally and readily be disposed of by permitting the same to spread over the low lands without the obstruction of the banks so constructed and maintained.

William S. Beecher, one of the officers of the plaintiff company, was one, and acted as one, of the selectmen of the town of New Haven during the period of the work in question.

The plaintiffs on the 1st of September, 1884, were, and

ever since have been, the owners and occupiers of the land described in the complaint, and upon the premises have, during that period, carried on the business of making friction matches.

The plaintiffs' premises are bounded for about five hundred feet easterly on West River, and are located about twelve hundred feet above and northerly of Whalley avenue.

The court rendered judgment for the plaintiffs to recover the sum of $922.88 damages and costs. The defendants appealed.

*C. R. Ingersoll*, for the appellants.

1. The town is not liable on the ground of negligence. Negligence in fact is not found, nor are any facts from which negligence in law results. Negligence, in law, is the failure to perform some act required or duty determined by the law. *Nolan* v. *N. York, N. Hav. & Hartford R. R. Co.*, 53 Conn., 471. Where one, in his interference with a watercourse, acts under authority of law, he is completely justified, unless chargeable with negligence. *Bellinger* v. *N. York Central R. R. Co.*, 23 N. York, 42; *Hull* v. *Westfield*, 133 Mass., 433. The officers of the town being engaged in the doing of a lawful act, were undoubtedly required by the law to do such act with all reasonable care and skill. But that is all. The law did not make them or the town insurers of the consequences of their work. "Where there is neither negligence nor folly, in doing a lawful act, a party cannot be chargeable with the consequences." *Burroughs* v. *Housatonic R. R. Co.*, 15 Conn., 131. And especially is this so with municipal corporations in whose negligence there must, generally, appear some element of wantonness. *Bronson* v. *Wallingford*, 54 Conn., 513; *Sutton* v. *Clarke*, 6 Taunt., 29. The finding is explicit as to the exercise of reasonable care and skill on the part of the town and its engineer. On this point the court finds as follows:—"The general plan of the river straightening necessitated an entirely new channel for the river for a distance of several hundred feet below Whalley avenue bridge,

and a consequent closing of the old channel in that locality by a bulkhead. In preparing the original specifications for the work at this spot for the contractor, the city engineer provided for a narrower but deeper channel than the old channel, and removed an obstructing island, so that the sectional area of the water-passage should not be less than that formerly existing. And in the judgment of the engineer the passage thus provided was amply sufficient to carry off the water coming and to come to that place as efficiently as it was carried off and discharged by the channel of the river before the change was made. The selectmen in approving this plan and contracting for its execution, intended to provide such a water-passage, and believed it had been so provided." But further. The finding is that the damage in question would not have resulted to the plaintiffs but for the exceptional character of the freshet. " The damage was caused by an exceptionally heavy rainfall, which, with the smooth and hard surface of the ground co-operating, occasioned severe freshets not only in West River but throughout a wide extent of country. It was an extraordinary freshet as compared with the ordinary annual overflows or freshets common to West River." Against such an extraordinary freshet, especially in combination with a frozen state of the ground that prevented any of the water from soaking into it, making a state of things that could not reasonably have been expected, the town was not bound to provide. *State* v. *Ousatonic Water Co.*, 51 Conn., 137; *Sprague* v. *City of Worcester*, 13 Gray, 193; *Smith* v. *Agawam Canal Co.*, 2 Allen, 355.

2. But if negligence is imputable to the selectmen by the finding, the town cannot be held liable for its consequences. The duty neglected was purely a public or governmental duty. *Jones* v. *City of New Haven*, 34 Conn., 1; *Hewison* v. *City of New Haven*, 37 id., 475; *Jewett* v. *City of New Haven*, 38 id., 368; *Mead* v. *City of New Haven*, 40 id., 72; *Mootry* v. *Town of Danbury*, 45 id., 550; *Perry* v. *City of Worcester*, 6 Gray, 544; *Sprague* v. *City of Worcester*, 13 id.,

193; *Tindley* v. *City of Salem*, 137 Mass., 171; *Seifert* v. *City of Brooklyn*, 101 N. York, 136.

3. Under any rule of municipal responsibility, the negligence complained of being in the plan of the work adopted by the town, and not in the execution of the work or its maintenance, the defendant cannot be held liable. It is now well settled, even in jurisdictions where the rule of municipal liability for negligence has never been as restricted as in Connecticut, that in undertaking a public work the adoption of the plan of the work is of a judicial nature, for errors in which the corporation or its officers are not liable. But after the plan is thus judicially adopted, the duty of constructing the work according to the plan and of keeping it in repair after construction is a ministerial duty, for negligence in which the corporation is liable. It is only necessary to cite the recent case of *Johnson* v. *District of Columbia*, 118 U. S. R., 19. In the present case the damage is found to have been caused " by the bulkhead across the old channel and the banks created by the placing of the excavated material upon the side of the new channel." But the placing of this material on the sides of the new channel, and the construction of this bulkhead across the old channel, were specifically required to be done by the contract as parts of the whole plan of work which was to be executed by the contract. It was in the preparation of this " original specification " and with regard to its specific requirements, that the engineer passed his judgment upon the sufficiency of the water-passage provided by the plan; and it was with this specification in view that the selectmen " approved the plan and contracted for its execution." And the finding is that the " work was faithfully performed by the contractors in accordance with the amended specifications and to the acceptance of the engineer," and this is the work which the selectmen " accepted and paid for."

*J. S. Beach* and *F. G. Beach*, for the appellees.

The plaintiffs' damage was caused by the defendant's attempt to straighten the channel of West River below

Whalley avenue. This was done, as is claimed, under an act of the General Assembly passed April 14th, 1881, which is stated in the finding. Before the change the river ran in a winding course through low lands from five to fifteen hundred feet wide, allowing the water in times of freshet to overflow and pond thereon. In the fall of 1884 the selectmen, without any survey made of the river or territory above Whalley avenue, on which the plaintiffs' premises are located, contracted for the straightening of the river below that avenue by excavating a new channel, narrower and deeper than the old one, pursuant to plans presented by their engineer and approved by them. The disposition of the earth taken out from the excavation formed no part of this plan of the engineer, but the contract of excavation called for its being used to make embankments on either side of the newly excavated channel as being "the easiest and cheapest mode of disposing of the excavated material," and it was so used. The plan of the engineer was made upon the theory that the waters of the river would continue to overflow the banks of the new channel and cover the low lands. And it is found that "if the material excavated had not been placed in the form of an embankment, and if the water had been left free to spread over the meadow unobstructed by such substantially continuous embankment, as it did before the new channel was made, the damage in question would not have been done."

The only legal question presented on the record is embodied in the third reason of appeal:—"It being proved that the acts complained of as being done by the defendant, were done in the honest discharge of a public or governmental duty, the law is so that judgment should have been rendered for the defendant." But although every governmental duty is of necessity a public duty, it is not true that every corporate public duty is governmental in the legal sense of that term. And this gives us as a starting point a denial of the proposition that a municipal corporation cannot be held liable for acts resulting in damage to an individual in the discharge of a corporate public duty, simply

because those acts were done in the honest discharge of that duty. Another element must be included in the proposition before it can be accepted as good law. The acts must be done not only in the honest discharge, but in a proper discharge of that duty; that is, in such manner as to do no unnecessary injury. With this element of the proposition embodied, the converse of the proposition is, that a municipal corporation in the honest discharge of a corporate public duty is liable, if an injury is caused by a neglect to use reasonable precautions to avoid doing any act which, being done, results in unnecessary damage to the individual citizen. And this proposition is sustained by the authorities. *Danbury & Norwalk R. R. Co.* v. *Town of Norwalk*, 37 Conn., 119; *Mootry* v. *Town of Danbury*, 45 id., 556; 2 Dillon on Mun. Corp., § 1050. If, therefore, this reason of appeal had read—"It being found that the acts complained of by the defendants were done in the honest discharge of a public corporate duty, the law is so that judgment should have been rendered for the defendants," the allegation would have been insufficient. Neither the law as stated, nor the facts as found, would warrant the claimed exemption. Not the law; for there is no allegation that the acts done were done in a proper discharge of that duty, and in such manner as to do no unnecessary damage to the plaintiff. Not the facts; because it is found that the damage done was not necessarily incident to the work, but was done by putting and allowing to remain on the banks of the river material which was put there, not as necessarily incident to the work, but as the cheapest and easiest mode of disposing of it, and that, the same being removed, the improvement was "equally adequate and adapted to the proper execution of the original plan;" and that "if the material excavated had not been placed in the form of an embankment, the damage in question would not have been done."

We now reach the other alternative set up for error in this reason of appeal. For we admit that it may fairly be read as alleging for error, that, "it being proved that the acts complained of as done by the defendants were done in

the honest discharge of a governmental duty, the law is so that judgment should have been rendered for the defendants." This topic opens a wide field for discussion. If we should attempt to traverse its length and breadth within the boundaries extending over the jurisprudence of all the states of the Union, the result would be a treatise rather than a brief. But the subject has been so often, so fully, and so recently considered by this court, that we may safely confine its discussion within the limits of these° adjudications, as found in *Jones* v. *City of New Haven*, 34 Conn. 1; *Hewison* v. *City of New Haven*, id., 136, and 37 id., 475; *Danbury & Norwalk R. R. Co.* v. *Town of Norwalk*, id., 109; *Judge* v. *City of Meriden*, 38 id., 90; *Torbush* v. *City of Norwich*, id., 225; *Jewett* v. *City of New Haven*, id., 368; *Ayer* v. *City of Norwich*, 39 id., 376; *Young* v. *City of New Haven*, id., 435; *Mead* v. *City of New Haven*, 40 id., 72; *Burritt* v. *City of New Haven*, 42 id., 174; *Weed* v. *Borough of Greenwich*, 45 id., 170; *Mootry* v. *Town of Danbury*, id., 550; *Healey* v. *City of New Haven*, 47 id., 305; *Bronson* v. *Borough of Wallingford*, 54 id., 513.

We submit as principles of law established by these decisions—1st. That where the duty is one imposed by the sovereignty of the state upon all its municipal corporations for the welfare of all the citizens of the state, it becomes a governmental duty. 2d. That as a general rule a municipal corporation in the execution of a governmental duty is not liable for any resulting damage to an individual, beyond such damage as is provided by the legislation which imposes the duty. 3d. That this is subject to limitations. The precise boundaries of these limitations cannot be defined with any such exactness as to enable one to announce in advance that any case exhibiting this or that feature is thereby to be included or excluded from the rule. Each case must appeal to its own merits for its title to inclusion.

The rule and its limitations can with more utility be illustrated than defined. To the extent that in any case direct injury results to an individual solely by reason of the exercise by a municipality of its judicial functions in respect to

governmental acts done within its jurisdictional powers, the individual is without remedy. As when a city in the discharge of its duty to keep its highways in repair, changes the grade of a street in accordance with plans judicially approved by that department of its government to which such power has been delegated. The adjoining owner may suffer direct loss to the extent of many thousands of dollars, but, if the ministerial duty of making the change has been properly done, he is without remedy. If, however, this duty is not properly done, as if for instance a traveler meets with disaster by being overturned into an unguarded cut, he has his remedy, and may recover either under the statute or at common law. So, too, if in the ministerial discharge of lowering the grade, the excavated material, instead of being removed, is deposited upon the land of the adjoining owner without any necessity therefor, but merely as the easiest and cheapest mode of disposing of it, he has his remedy for any resulting injury. Again; if the plan so judicially approved calls for a certain uniform change of grade and the change is not so made, a property owner is not without remedy for resulting injury. In the application of these principles to the facts disclosed upon the record it appears—

1. That the duty which the defendant was attempting to discharge " by raising the banks of the river and narrowing its channel," except for which " the water of the river would not have invaded the plaintiff's premises so as to have caused the damage," was not a governmental duty.—(1st.) There was and is no general law imposing upon towns the duty of straightening rivers and streams within their limits.—(2d.) Not only was there no duty imposed upon the town of New Haven to straighten West River, but it had no power so to do under the general law.—(3d.) It acquired from the legislature of the state the power and privilege of straightening the river at its own request and upon its own application.—(4th.) This power and privilege having been granted to the town, the option to act under the grant resided in the selectmen, and was not a duty which could be enforced upon failure of performance.

2. If the duty in the discharge of which this damage was done had been in its character governmental, the corporation would have been liable.—(1st.) In its ministerial performance of that duty the town departed from the plans which its proper officers had judicially approved in two features—in raising the banks of the river, and in narrowing its channel. " The plan of the engineer for the straightening of the channel did not of necessity call for raising its banks and narrowing its channel."—(2d.) The plaintiff's damage was the direct result of this departure in the ministerial execution of the duty the town attempted to perform. It is found that " the amendments of the original plan were adequate and adapted to the proper execution of the original plan, and if the material excavated had not been placed in the form of an embankment, and if the waters had been left free to spread over the meadow unobstructed by such substantially continuous embankment, as they did before the new channel was made, the damage in question would not have been done."

PARK, C. J. In the year 1881 the selectmen of the town of New Haven straightened and deepened the channel of West River, which flowed through the western part of the town and emptied into the harbor. The course of the river was winding and its width varied from five hundred feet in some places to fifteen hundred in others. It ran through low meadow lands, covering them to a considerable extent, and became thus a source of malarial disease. Complaint was made of its injury to the public health, and the purpose of the selectmen in straightening and deepening the channel of the river was to confine it to narrow limits and thus put a stop to its deleterious influence. It was the abatement of a nuisance. It was a sanitary measure, and a necessary one.

Two avenues crossed the river, which were public highways of the city and town. One, Whalley avenue, was on the north, and the other, Derby avenue, was on the south

of the meadow through which the river flowed.    The altera-
tions of the channel extended from one avenue to the other.

The town employed the best engineering skill for the
preparation of the plans for the work, and everything was
done in accordance with the plans thus prepared.    In the
opinion of the engineers, as ample provision was made for
the passage of the water below Whalley avenue as existed
before.    The selectmen intended to secure this and believed
they had done so.

Before the change in the channel of the river the water, in
times of freshet, overflowed the banks and became ponded
on the low meadow lands, and it was thought that the change
in the channel would make no difference in this respect.
But the earth thrown out in excavating the new channel
was placed on the sides of the channel in such a manner as
to prevent this overflow, and this, with the stopping up of
the old channel, caused the water to set back in times of
flood, and the water thus set back did the damage com-
plained of by the plaintiffs.    With regard to the character
of the flood and the circumstances attending it the court
finds as follows :—

" It occurred at the time of an exceptionally heavy rain-
fall in the winter season of 1885, which, with the smooth
and hard surface of the ground co-operating, occasioned
severe freshets, not only in West River, but throughout a
wide extent of country.    It was an extraordinary freshet as
compared with the ordinary annual overflows or freshets
common to the river. * * * The freshet was unusual and
extraordinary but not unprecedented; and had the rise in
the river been only the ordinary annual freshet the damage
to the plaintiffs would not have resulted. * * * In addi-
tion to the annual freshets, the river was subject in occa-
sional years to extraordinary freshets or floods, which
should be expected occasionally to occur. * * * The water-
way span of Whalley avenue bridge is one hundred feet,
and is ample to take and discharge all water coming in
such extraordinary freshets or floods occasionally occurring,
and the waters of such freshets could easily and readily be

disposed of by permitting the same to spread over the low meadow lands without the obstruction of the banks of the new channel."

These are the principal facts of the case. It is expressly found that the work was done under authority conferred upon the town by a private act passed by the legislature in 1881, and which may be found among the acts of that year, page 230. That act authorized "the town of New Haven, acting by and through the selectmen thereof," to "deepen, clear out, alter and straighten any and all streams and water-courses, natural and artificial, or any portion thereof," within the limits of the town, "in order to protect and preserve the public health," and they were authorized to do it "at such times and in such manner as the public health, in the opinion of the selectmen, may require."

Acting under this authority, the selectmen of the town, believing that the preservation of the public health required that certain alterations in the channel of West River should be made, employed the city engineer to make an examination and determine what could be done to accomplish the object. The work involved a problem of scientific engineering. It required, for the abatement of the nuisance, that the channel of a winding and sluggish river should be straightened, to keep its waters from spreading over a wide expanse of territory. The question was, how this could be done in the most efficient manner with reference to confining the water within the new channel, and at the same time provide an ample way for all the water passing under the Whalley avenue bridge, which opening, the case finds, was ample for the passage of all water coming down the river at all times, extraordinary as well as ordinary.

The matter had thus to be considered prospectively. The selectmen were to judge as well as they were able of future results. The best human judgment is liable to err in such a case. After an injury has occurred, and all the facts with regard to it have been investigated, it is often quite easy to see how it might have been avoided, but with a slight change in the circumstances a new case would be presented,

in dealing with which human judgment would be liable to be again in error. All that can be expected or required is, that officials, in the performance of a duty, shall bring to the service reasonable care and judgment, and that professional men employed by them in planning and superintending the work shall have all the knowledge and skill that experience in such work would naturally give them. It would seem in this case that such care was exercised by the selectmen, and that such skill and experience were brought by the city engineer to his part of the work. No complaint is made of any want of skill in the engineer or of intelligent and careful consideration of the matter on the part of the selectmen. Every effort seems to have been made by both to have the work so done, as, while effecting the great object for which it was undertaken, to do as little harm as possible to private property. And it does not appear that the work was not so done as to secure the safety of contiguous property in all ordinary freshets, that is, in such as might reasonably be expected and therefore ought to be provided for. The case finds that ample provision was made for all ordinary floods in the river, and that it was only an extraordinary rainfall in the winter season, when the ground was frozen and not able to absorb the water, that could produce such a flood as the one that caused the damage complained of to the property of the plaintiffs.

In the case of *The State* v. *The Ousatonic Water Co.*, 51 Conn., 137, this court, in remarking upon a case of this sort, said :—" The defendants were bound to provide against all the natural results of ordinary freshets in the river, whenever they might occur, and with whatever ordinary combination of circumstances they might be attended. The defendants were not bound to make provision against extraordinary freshets in the river, which rarely happen, or against extraordinary effects of ordinary freshets, owing to some peculiar and uncommon combination of circumstances. They were bound to consider and prepare for the ordinary results of ordinary freshets, and not extraordinary freshets nor extraordinary results." This was said with reference to

the building of a dam by the defendants over the Housatonic River, but the same can be said with equal propriety in the case at bar.

In *Smith* v. *Agawam Co.*, 2 Allen, 355, the court, in remarking upon extraordinary freshets, says :—" The changes which result from such causes are uncertain in extent and in the times of their occurrence; and the losses of which they are the occasion must be borne by those upon whom they fall." And in *Sprague* v. *City of Worcester*, 13 Gray, 193, the court remarks as follows upon the same subject :— " By the exception of extraordinary freshets for unimportant periods of time, we consider was meant freshets not ordinarily occurring annually, but which come occasionally."

But it is said that the flood which did the damage in this case, though unusual, was not unprecedented, and that such extraordinary floods had sometimes, though infrequently, occurred, and ought therefore to have been expected and provided for. But the flood in the case of the Housatonic River referred to was not an unprecedented one, and yet the defendants were held not to be liable in that case, their liability or non-liability depending upon the character of the flood as in this case. An extraordinary freshet, in the view there taken of the matter, is not necessarily an unprecedented one, but it may be one that happens so rarely or in such unusual circumstances, that it is not to be expected. And it was so regarded in the cases cited from Massachusetts. And it is to be specially noticed in this case that, aside from the extraordinary character of the flood, the frozen condition of the ground added greatly to its effectiveness for mischief. The water was not in part disposed of, as would happen in most floods, by soaking into the ground, but was compelled to flow in full tide within the frozen banks. This incident of the flood, in combination with the extraordinary rainfall, could not have been regarded as falling within ordinary probabilities, and therefore was not reasonably to be expected.

But it is said that the raising of the banks of the new channel was no part of the engineer's plan, but was done by the contractor under the authority of the selectmen as the

cheapest and most convenient mode of disposing of the earth thrown out in digging the new channel; and that it is found that the damage complained of would not have been done but for this raising of the banks, which held all the water within the new channel instead of its overflowing and escaping upon the low lands adjoining the river. But it is expressly found that the first contract for the excavation of the new channel contained among its specifications a provision for this precise thing, that is, that "the material excavated from the new channel should be deposited on each side of the cut;" and it is further found that the specifications were prepared by the city engineer. It also appears that the engineer was to supervise the work and that any imperfect work was to be immediately corrected upon his requirement and that the work was in fact done to his acceptance. Upon these facts it is impossible to regard the raising of the banks as done by the selectmen upon their own judgment and in disregard of the plans and advice of the engineer. If there was misjudgment in the matter we must regard it as that of the engineer and not of the selectmen. As the placing upon the banks of the earth thrown out was the natural and ordinarily the proper mode of disposing of it, it was a failure of duty on the part of the engineer, if it was no part of his plan and he saw the danger arising from it, not to indicate upon his plan, or in some mode have made it clear to the selectmen, that it ought not to be done. Especially was he in fault if, seeing the danger from it, he yet drew the specification which required it. But as the selectmen had employed a competent engineer, the town cannot be liable for his oversights or misjudgments.

We have not thought it necessary to consider the question so ably argued before us, whether the duty discharged by the town was a governmental one, giving it some exemption from liability that would not exist if the duty was not of such a character, because, upon the theory which would hold the town to the highest liability, we think there was no negligence on the part of the selectmen by which the town could be made liable.

We think the defendant town was not liable, upon the facts found, for the damage done to the plaintiffs in this .case.

There is error in the judgment appealed from and it is reversed.

In this opinion the other judges concurred.