THE PLEASURE BEACH PARK COMPANY *vs.* THE BRIDGEPORT DREDGE & DOCK COMPANY.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued March 7th—decided April 11th, 1933.

*Harry Schwartz,* with whom was *Albert J. Merritt,* for the appellant (plaintiff).

*Harry B. Dinerstein,* with whom was *Ralph S. Kantrowitz,* and, on the brief, *Joseph G. Shapiro, Harry A. Goldstein* and *Charles S. Brody,* for the appellee (defendant).

HAINES, J. The plaintiff owned and operated a pleasure park near Bridgeport, with a bridge over an arm of the sea connecting the park with the mainland, while the defendant owned a shipyard and docks a short distance to the north. Moored to the docks were several boats, including a dredge, a pile driver and a barge, and about eleven a. m. March 8th, 1931, these

broke away in a storm. The barge was blown through the draw of the bridge and did no damage, but the dredge and pile driver were blown against the bridge causing injury to the latter, and the plaintiff brings this suit to recover compensation therefor. The defendant pleaded that the breaking away and damage were the result of an act of God, which consisted of "an unusually severe and extraordinary storm, and unusual and unprecedented conditions of weather, wind and tide;" and that there was no negligence on the defendant's part which in any way contributed to the injuries inflicted upon the plaintiff's bridge. The trial court sustained these defenses and gave judgment for the defendant accordingly.

From the subordinate facts the trial court reached two conclusions: (1) that "the immediate cause of the boats going adrift, was a storm of such violence and so unprecedented that it was an act of God in the sense that the full force of the storm as it was at about eleven o'clock when the boats broke adrift could not reasonably have been expected," and (2) that "the defendant and its agents did not do anything which a reasonably prudent person would not have done nor did they fail to do anything which a reasonably prudent person would have done under the circumstances having in mind that the boats would be subject to the force of such storms as might reasonably be expected at the time and place." The claim that these two conclusions are erroneous is the chief ground of the present appeal.

Error is predicated upon the failure of the trial court to find certain facts and also upon certain paragraphs of the finding as made. One of the latter relates to the physical condition of the dock and the other to the method of mooring the boats thereto. It was found that the dock was old, but in fair condition; that

neither the stringer at any point where the pile driver or dredge was moored to it, nor the mooring piles to which it was moored, were materially rotted; that the stringer was in good condition and the piles were sound except that some decay had occurred at the very top of the piles, a considerable distance above the part to which the lines were tied. It was also found that in every particular the method in which the pile driver and the dredge were then moored to the dock, complied with the standard method ordinarily used by mariners and dock men to moor vessels of that character for long periods of time.

Attack is also made upon the three other paragraphs of the finding. One is to the effect that there was nothing in the condition of the dock or its equipment which was faulty in any particular which materially contributed to the breaking away of the boats. A second is that none of the employees of the defendant omitted to do anything which reasonable foresight and prudence would have dictated and which would have prevented the boats from breaking away; while the third is that the breaking away of the boats was caused entirely by the force of the storm which in its full measure, could not within reason, have been foreseen, and if it had, could not have been successfully guarded against.

Much of the testimony was conflicting, but a careful study of the entire record reveals sufficient credible evidence to justify the findings here objected to, while no warrant can be found for the addition of any important relevant facts from the draft-finding except that we have felt justified by the evidence in adding certain facts to the effect that Duffy, an ordinary laborer, with only such experience as he had had in assisting in handling the lines of vessels, was the only man left in charge at the dock when the dock master

left to get his breakfast; that the regular dock force consisted of six men, but this being Sunday, none of them except Duffy were present when the boats broke away. The remaining claims in the draft-finding are either unimportant to this inquiry, or are not undisputed facts.

The essential factual situation reflected by the record may be sufficiently summarized as follows: The defendant's dock master knew of certain storm warnings issued by the United States Weather Bureau three days before March 8th, 1931, and went to the docks about nine this Sunday morning with the realization that a storm was developing. These boats were then moored to the dock as they had been for some time, the pile driver by two lines extending from one end of the boat to the dock, one fastened to a mooring pile and one to the stringer of the dock, and by two lines extending from the other end of the boat to the dock, one fastened to the stringer and the other either to the stringer or to a mooring pile, and by two spring or check lines. The dredge was moored by two lines from the bow, one of these lines doubled, leading to a mooring pile on the dock, and the other line to the stringer, and by two lines from the stern of the boat to the stringer, and by one check line. Sufficient slack had been left in the lines to allow for somewhat more than the normal rise and fall of the tide. All the lines were of large manila rope, apparently in good condition, although it is impossible to tell by visual inspection, whether such rope is in good condition. The stringer to which some of the lines were fastened was a large square timber laid horizontally around the outer edge of the dock and bolted at frequent intervals into the piles which support the dock, but none of the lines were padded where they came in contact with the stringer as is sometimes but not customarily done.

The mooring piles were large piles such as are customarily used for mooring purposes at a dock. The stringer was in good condition and the piles were sound except that some decay had occurred at the extreme top of them a considerable distance above the point where the lines were fastened. This was the standard method of mooring boats of this character so situated. The wind was from such a direction that the pile driver was receiving the full force of the storm, and as soon as he arrived at the dock, the dock master tied a steel cable from the rear end of the pile driver to the stringer in addition to the rope lines. The dock master had had a long experience in work of that kind and after carefully inspecting the situation, reasonably believed that everything was in good condition and that the boats would be held to the dock through the storm then raging and through any storm of a severity which would ordinarily be expected to strike that spot. He then left one of the dock crew, Duffy, in charge, and about ten-thirty went to his home to get some breakfast and dry clothing. Duffy's experience had been confined to assisting others in mooring boats. The storm developed rapidly into one of unprecedent violence at least for many years, and the tide was the highest in the memory of man, while such a swell or surge of water as occurred was extremely rare. Two miles inland, at the weather observatory, the wind velocity was fifteen miles per hour from seven to ten o'clock, and from then to twelve o'clock, twenty miles, while before two o'clock it had reached a velocity of thirty miles. The velocity at this dock was somewhat higher than two miles inland, and there were frequent gusts of wind far in excess of the stated velocity. The tide ordinarily rises about six feet above mean low water, but this day rose eleven and a half feet, and these combined conditions brought

the waves in over the top of the breakwater which ordinarily protected this location. After the dock master left, the wind, swell and surge of the water, increased so rapidly and so tossed the boats about that it was not feasible to get on board to attach additional lines or cables or take other means of fastening them further.

The defensive plea of act of God, is not an uncommon one where the forces of nature have played a part in the destruction of man's possessions. It was said by CHIEF JUSTICE SWIFT in an early decision in this State, that "under the term act of God are comprehended all misfortunes and accidents arising from inevitable necessity, which human prudence could not foresee or prevent;" *Williams* v. *Grant* (1816) 1 Conn. 487, 491; and it has been referred to by definition or by recital in many other decisions in this State, of which the following are illustrative; its significance as a defense being that when a sole cause of the damage, it exempts a defendant from liability for negligence. *Crosby* v. *Fitch,* 12 Conn. 410, 419; *Hale* v. *New Jersey Steam Navigation Co.,* 15 Conn. 539, 544; *State* v. *Ousatonic Water Co.,* 51 Conn. 137, 142; *Feeney v. New York Waist House,* 105 Conn. 647, 649, 136 Atl. 554; *Donnelly Brick Co., Inc.* v. *New Britain,* 106 Conn. 168, 137 Atl. 745.

It is clear that the direct cause of the breaking away of the boats was the severity of the storm then raging. Such manifestations of the forces of nature are of course beyond the power of man to control, and in this sense the storm was an act of God. In an action for damages under the circumstances, however, it is necessary to pursue the inquiry somewhat further, for the test of a defendant's liability has to do with his participation, if any, in the cause which has produced the damage. The test is whether the injury, though

the storm be the direct cause, is yet referable in some degree to the defendant's unreasonable failure to anticipate the danger which arose and to take rational and reasonable precautions to ward off the probable consequences of the storm. It is the duty of a defendant to be reasonably vigilant to avert disaster by such means as might reasonably be utilized under the circumstances. A failure thus to act may, in a given case, amount to a concurrence with the forces of nature and be held a contributory proximate cause of and a substantial factor in the resulting injury. Speaking generally, therefore, the liability of this defendant for the plaintiff's injury, is governed by the test which is commonly applied in all negligence actions, viz.: did the defendant use that care which a reasonably prudent, experienced and capable man would have used under all the circumstances which were known or should have been known to him?

His conduct is not to be tested by his knowledge and experience after the event. Knowledge thus gained might require a care and a provision against the results of a storm which he could not be reasonably expected to have put forth before the event. *Diamond Match Co.* v. *New Haven,* 55 Conn. 510, 526, 13 Atl. 409. His action is to be tested by such facts as he knew, or, within reason, should have known, and he was chargeable with knowledge of such facts as were accessible to him and likely to be considered and acted upon by a reasonable man in his position, before the storm had worked its mischief. "Nothing more can be exacted than such wisdom and prevision as the ordinary man would have manifested to avoid a hazard or forestall a danger of which some warning actually had been given by previous experience or fairly would be disclosed by the application of sound judgment to an observation of general climatic conditions, prevail-

ing customs and all available sources of information naturally to be resorted to by a reasonable man." *Hecht* v. *Boston Wharf Co.*, 220 Mass. 397, 402, 107 N. E. 990. It appears from the finding that the dock master was a man of long experience in such matters, and with full knowledge of weather conditions generally prevailing at this location, as well as of the docks, boats and appliances under his care, and had used all reasonable means which a careful and prudent person in that situation would ordinarily have had recourse to. He was a "man of ordinary sagacity and experience, acquainted with all the conditions," and yet could not reasonably have anticipated the force of this storm as probable, in the natural and ordinary course of things. *Lombardi* v. *Wallad*, 98 Conn. 510, 518, 120 Atl. 291; *Kelsey* v. *Rebuzzini*, 87 Conn. 556, 562, 89 Atl. 170. It appears also that it was not naturally to be anticipated that this storm was to develop into one of those outbursts of the elements the cause and effects of which could not be prevented "by the exercise of prudence, diligence, and care, and the use of those appliances which the situation of the party renders it reasonable that he should employ." *Fay* v. *Pacific Improvement Co.*, 93 Cal. 253, 261, 26 Pac. 1099, 1100. In short, we deem these conclusions of the trial court to have been reasonable and just under the established facts and the controlling law of the case.

There is no error.

In this opinion the other judges concurred.