JEAN V. ELLIOTT, ADMINISTRATRIX (ESTATE OF KEVIN ELLIOTT) *v.* CITY OF WATERBURY ET AL.
(SC 15699)

Callahan, C. J., and Borden, Berdon, Katz and Palmer, Js.

---

Argued December 11, 1997—officially released July 14, 1998

*Michael F. O'Connor*, for the appellant (plaintiff).

*Linda L. Morkan*, with whom, on the brief, was *John H. Gorman*, assistant corporation counsel, for the appellees (named defendant et al.).

*Philip T. Newbury, Jr.*, with whom was *Thomas R. Gerarde*, for the appellees (defendant town of Morris et al.).

*William F. Gallagher, Cynthia C. Bott* and *Kurt D. Koehler* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities et al. as amici curiae.

*Opinion*

BORDEN, J. The principal issue in this appeal is whether General Statutes § 52-557n (b) (6)[1] establishes a sole proximate causation standard, or some other heightened causation standard, in order to establish the tort liability of a municipality or its employees, officers or agents. The plaintiff, Jean V. Elliott, the administratrix of the estate of Kevin Elliott (decedent), appeals

---

[1] General Statutes § 52-557n (b) provides in relevant part: "[A] political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from . . . (6) the act or omission of someone other than an employee, officer or agent of the political subdivision . . . ."

from the trial court's summary judgment[2] in favor of the named defendant, the city of Waterbury, and the defendant employees and officers of that city (Waterbury defendants), and the defendant town of Morris, and the defendant employees and officers of that town (Morris defendants), on all counts of her complaint against them.[3] The action arises out of the alleged unintentional shooting of the decedent by Robert W. Cook, who was hunting on watershed land owned by the city of Waterbury and located in the town of Morris.[4] The plaintiff claims that the trial court improperly concluded that, given the intervening role of Cook in causing the death of the decedent, § 52-557n (b) (6) shields the municipal defendants from liability for nuisance and negligence. The Waterbury defendants and the Morris defendants argue that the trial court's grant of summary judgment in their favor on the nuisance and negligence claims was proper because § 52-557n (b) (6) establishes either a sole proximate causation or a "direct" causation standard that bars liability for the alleged nuisance and

---

[2] The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

[3] The defendant officers and employees of the city of Waterbury at the time of the decedent's death were: Joseph Rainone, the superintendent of the water department; Mary Lonergan Iorio, the supervisor of reservoirs; Edward D. Bergin, the mayor; and Rosario Minnocci, a member of the board of public works. The defendant officers and employees of the town of Morris at the time of the decedent's death were: Philip D. Birkett, the first selectman; Edward Dorsett, a selectman; Frederick Neri, a selectman; and John Allyn, the highway department foreman. Hereafter, we refer to all of the defendant officers and employees of the city of Waterbury and the town of Morris collectively as the "defendants."

The complaint originally named J. Robert Carroll, Waterbury's director of public works, Samuel Liesring, Waterbury's park director, and "John and Jane Doe . . . agents, servants or employees of the City of Waterbury," but the plaintiff subsequently withdrew the action as to those four defendants.

[4] The Waterbury defendants filed a third party complaint against Cook. The plaintiff thereafter amended her complaint by adding a negligence claim against Cook. Neither the third party complaint nor the plaintiff's complaint against Cook is involved in this appeal.

negligence in this case. We conclude that § 52-557n (b)
(6) does not establish either such standard. Accord-
ingly, we reverse the judgment of the trial court as to
the nuisance claim against the Waterbury defendants.
As to the other counts, however, we affirm the judgment
of the trial court on other grounds.

The trial court summarized certain material, undis-
puted facts as follows. On November 11, 1992, "[the
decedent] was jogging on Pitch Road, an unpaved road
in Morris when he was unintentionally shot and killed
by . . . a person who was hunting in the watershed
area adjacent to the road and owned by Waterbury.
Pitch Road was a Morris town road, unpaved with a
gravel surface, used as [a means of] access to the Water-
bury reservoir from [Route] 109. The road was plowed
by Morris during large storms to the dam area so that
Waterbury workers could daily read instruments at the
reservoir. . . . Pitch Road was also used by walkers
and joggers, [and] hunters used it as well to gain access
to the watershed area north of Route 109. Waterbury
allowed hunting on its watershed property and Robert
Cook was hunting on the day this incident occurred."
In addition to these facts, the following undisputed facts
are also relevant to our analysis: the watershed property
consisted of 1800 acres; and, with regard to that prop-
erty, Waterbury paid Morris an unspecified amount in
lieu of taxes.

The relevant procedural history is not in dispute. The
plaintiff initially filed this wrongful death action against
the Waterbury defendants and the Morris defendants,
and subsequently amended her complaint to add claims
against Cook. See footnote 4 of this opinion. Counts one
through four and count eight of the amended complaint
are against the Waterbury defendants. The first count
alleges that the city and its employees were negligent for
allowing hunting on the watershed property and failing
to take steps to make the activity safe. The second count

is a claim for indemnification of the individual Waterbury defendants by the city of Waterbury with respect to the negligence count pursuant to General Statutes § 7-465.[5] The third count alleges that the Waterbury defendants created a public nuisance by allowing hunting on the watershed land. The fourth count alleges that the Waterbury defendants were wanton and reckless in failing to take appropriate steps to alleviate the danger posed to pedestrians on Pitch Road by the hunting on the watershed property, despite actual knowledge of that danger. The eighth count alleges that the Waterbury defendants engaged in wilful and malicious misconduct by failing to guard or warn against the dangers posed by the hunting on the watershed property.

Counts five, six and seven of the amended complaint are against the Morris defendants. The fifth count alleges that the Morris defendants were negligent by failing to post signs on Pitch Road warning of the hunting, failing to close the road to the public and failing to prohibit hunting on the land adjacent to Pitch Road. The sixth count alleges that the Morris defendants were wanton and reckless in failing to take those steps to alleviate the danger, despite actual knowledge of that danger. Finally, the seventh count alleges that the Morris defendants created a public nuisance by "maintain[ing] Pitch Road as a public roadway open to members of the general public, despite dangerous conditions created by the hunting on adjacent property . . . ."

---

[5] General Statutes § 7-465 provides in relevant part: "(a) Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality, except firemen covered under the provisions of section 7-308, and on behalf of any member from such municipality of a local emergency planning district, appointed pursuant to section 22a-601, all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such

The Waterbury defendants and the Morris defendants moved for summary judgment, and the trial court granted their motions as to all counts against them. This appeal followed, which challenges the judgment of the trial court as to all claims against the Waterbury defendants—counts one through four and count eight of the complaint—and the negligence and nuisance counts against the Morris defendants—counts five and seven of the complaint.[6]

Before turning to the specific issues, we note that "[t]he standard of review of a trial court's decision to grant a motion for summary judgment is well established. Practice Book § 384 [now Practice Book (1998 Rev.) § 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 250, 654 A.2d 748 (1995).

I

We first address the principal issue raised by this appeal: whether § 52-557n (b) (6) establishes a sole proximate causation standard, or some other heightened causation standard, regarding the liability of a municipality and its employees, officers or agents. Section 52-557n (b) provides in relevant part that "a political subdivision of the state or any employee, officer or

occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty. . . ."

[6] The plaintiff has not challenged the trial court's summary judgment in favor of the Morris defendants on her sixth count, which alleges recklessness on their part.

agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from . . . (6) the act or omission of someone other than an employee, officer or agent of the political subdivision . . . ." The trial court concluded that § 52-557n (b) (6) establishes either "a rule that [in order for a municipality or its agents, officers or employees to be held liable] a person must be injured solely and proximately from the acts or omissions of the municipality . . . [or] a rule that the municipality's negligence be the direct cause of the injury and not that of a third party." Given the role of Cook in causing the death of the decedent, the court concluded that § 52-557n (b) (6) provides immunity for the Waterbury defendants from liability on the negligence and nuisance claims under counts one through three of the complaint, regardless of which of these two rules the subsection is thought to embody.[7]

The plaintiff claims that the trial court improperly interpreted § 52-557n (b) (6). Essentially, she argues that the provision is a codification of the basic common-law notion that municipal defendants, like any defendants, are not liable for the acts of others who are not employees or agents of the municipality. She claims that the provision should not be interpreted as incorporating a sole proximate cause standard or a "direct cause" standard because either rule would represent a dramatic shift away from the common-law standards concerning causality in tort actions against municipalities or their employees, without a clear indication of

---

[7] The trial court also concluded, alternatively, that the doctrine of governmental immunity supported summary judgment in favor of the Waterbury defendants on the negligence claim and the associated claims pursuant to § 7-465 for indemnification of the individual Waterbury defendants by the city under counts one and two of the complaint. We affirm the judgment of the court as to these two counts on this alternate basis in part II of this opinion.

such a legislative intention in the text of the statute or its legislative history.

The Waterbury defendants assert that the trial court's conclusion that § 52-557n (b) (6) establishes either a sole proximate causation standard or a "direct causation" standard was correct. The core of their argument is the "basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions." (Internal quotation marks omitted.) *Castagno* v. *Wholean*, 239 Conn. 336, 346, 684 A.2d 1181 (1996). "[O]nly by the adoption of one of these two standards," they argue, "is it possible for this Court to give any true meaning to § 52-557n (b) (6)." The Morris defendants agree with the Waterbury defendants' interpretation of § 52-557n (b) (6). They maintain that the provision constitutes an alternative ground for affirmance of the trial court's judgment on the negligence and nuisance counts against them. We agree with the plaintiff that § 52-557n (b) (6) does not embody either a sole proximate cause standard or a "direct cause" standard.

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 431, 692 A.2d 742 (1997).

We first consider the defendants' argument that § 52-557n (b) (6) incorporates a sole proximate causation standard. We begin our analysis by examining the statute's text. "[Section] 52-557n,[8] entitled 'Liability of political subdivision and its employees, officers and agents,'

[8] General Statutes § 52-557n provides in relevant part: "(a) (1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties; (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit; and (C) acts of the political subdivision which constitute the creation or participation in the creation of a nuisance; provided, no cause of action shall be maintained for damages resulting from injury to any person or property by means of a defective road or bridge except pursuant to section 13a-149. (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

"(b) Notwithstanding the provisions of subsection (a) of this section, a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from: (1) The condition of natural land or unimproved property; (2) the condition of a reservoir, dam, canal, conduit, drain or similar structure when used by a person in a manner which is not reasonably foreseeable; (3) the temporary condition of a road or bridge which results from weather, if the political subdivision has not received notice and has not had a reasonable opportunity to make the condition safe; (4) the condition of an unpaved road, trail or footpath, the purpose of which is to provide access to a recreational or scenic area, if the political subdivision has not received notice and has not had a reasonable opportunity to make the condition safe; (5) the initiation of a judicial or administrative proceeding, provided that such action is not determined to have been commenced or prosecuted without probable cause or with a malicious intent to vex or trouble, as provided in section 52-568; (6) the act or omission of someone other than an employee, officer or agent of the political subdivision; (7) the issuance, denial, suspension or revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such failure or refusal constitutes a reckless disregard for health or safety; (8) failure to make an inspection or making an inadequate

contains two subsections. Subsection (a) sets forth general principles of municipal liability and immunity, while subsection (b) sets forth [ten] specific situations in which both municipalities and their officers are immune from tort liability." *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 185, 592 A.2d 912 (1991). Subdivision (6), the provision at issue in this case, is one of the ten exemptions from tort liability enumerated in subsection (b) of § 52-557n. Neither the plaintiff nor the defendants claim that the language of the provision alone; see footnote 1 of this opinion; dictates adoption of their respective proposed interpretations. Likewise, all parties tacitly admit that it could support either the plaintiff's or the defendants' interpretation.

The statutory context of subdivision (6) of § 52-557n (b), however, calls into question the defendants' principal argument, namely, that this provision must be construed as incorporating a sole proximate causation standard because of the presumption that the legislature did not intend to enact superfluous provisions. See, e.g., *State* v. *Anonymous*, 237 Conn. 501, 515, 680 A.2d 956 (1996) ("[w]e consider the statute as a whole with a view toward reconciling its parts in order to obtain

or negligent inspection of any property, other than property owned or leased by or leased to such political subdivision, to determine whether the property complies with or violates any law or contains a hazard to health or safety, unless the political subdivision had notice of such a violation of law or such a hazard or unless such failure to inspect or such inadequate or negligent inspection constitutes a reckless disregard for health or safety under all the relevant circumstances; (9) failure to detect or prevent pollution of the environment, including groundwater, watercourses and wells, by individuals or entities other than the political subdivision; or (10) conditions on land sold or transferred to the political subdivision by the state when such conditions existed at the time the land was sold or transferred to the political subdivision. . . ."

Number 92-198 of the 1992 Public Acts added subsection (c) to § 52-557n. That subsection, which concerns immunity of board members of local boards and commissions who are not compensated for their membership, is not at issue in this case.

a sensible and rational overall interpretation" [internal quotation marks omitted]). In particular, several of the other subdivisions in subsection (b) would themselves be rendered superfluous if we were to interpret subdivision (6) as establishing a sole proximate causation standard. Examples include § 52-557n (b) (9), which shields municipalities and their officers, employees and agents from liability for "failure to detect or prevent pollution of the environment, including groundwater, watercourses and wells, by individuals or entities other than the political subdivision"; § 52-557n (b) (10), which immunizes municipalities and their officers, employees and agents from liability for "conditions on land sold or transferred to the political subdivision by the state when such conditions existed at the time the land was sold or transferred to the political subdivision"; and § 52-557n (b) (8), which prevents liability from attaching to municipalities and their officers, employees and agents for "failure to make an inspection or making an inadequate or negligent inspection of any property . . . to determine whether the property complies with or violates any law or contains a hazard to health or safety . . . ." Each of these provisions shields municipalities and their officers, employees and agents from liability in specific circumstances where damages have been caused largely by outside forces or actors. If § 52-557n (b) (6) established a sole proximate causation standard, however, none of these provisions would add anything to the meaning of the statute.

Moreover, the legislative history buttresses our conclusion that § 52-557n (b) (6) does not establish a sole proximate causation standard. "Section 52-557n of the General Statutes was enacted as § 13 of the Tort Reform Act of 1986 [Public Acts 1986, No. 86-338]. The Tort Reform Act was drafted in response to rapidly rising insurance rates, which, some believed, would be curtailed if tort liability could be limited and systematized.

As finally enacted, the act represents a complex web of interdependent concessions and bargains struck by hostile interest groups and individuals of opposing philosophical positions."[9] *Sanzone* v. *Board of Police Commissioners, supra,* 219 Conn. 185.

In *Sanzone,* we searched the legislative history of § 52-557n for guidance as to the meaning of a provision unrelated to the present appeal.[10] We commented: "Unfortunately, the legislative history of § 52-557n is worse than murky; it is contradictory. . . . The transcripts of legislative hearings on the bill are full of heated debate over § 13 [of the Tort Reform Act], dealing with municipal liability, but the legislators seemed not to agree as to its meaning. The record of legislative debate does indicate that § 13 was intended, in a general sense, both to codify and to limit municipal liability, but it also reflects confusion with respect to precisely what part of the preexisting law was being codified, and what part was being limited." Id., 188. The legislative history of the provision at issue in the present case, § 52-557n (b) (6), is equally murky. There was no direct reference to it in any of the debate on the proposed bill in either legislative chamber, nor was any testimony presented regarding it in the hearings of the Joint Committee on the Judiciary devoted to the bill.

It is therefore difficult to draw clear conclusions regarding the meaning of the provision from the bill's

[9] The Waterbury defendants cite the second sentence of this quote from *Sanzone,* concerning the belief of some legislators that insurance rates could be reduced through limitation of tort liability, in support of their argument for construing the statute to establish stringent causation requirements in regard to municipal liability. The following sentence in the quote characterizing the ultimate legislation as "a complex web of interdependent concessions and bargains struck by hostile interest groups and individuals of opposing philosophical positions"; *Sanzone* v. *Board of Police Commissioners, supra,* 219 Conn. 185; however, undercuts any attempt to use *Sanzone* in support of so simplistic an analysis of the legislative history of the Tort Reform Act.

[10] The provision at issue in *Sanzone* was § 52-557n (a) (1) (C). See *Sanzone* v. *Board of Police Commissioners, supra,* 219 Conn. 185.

legislative history. That history, however, does provide a strong indication that the interpretation proffered by the defendants is incorrect. As initially passed by the House of Representatives, the municipal liability section of the legislation, § 13, contained a provision, later dropped from the bill, immunizing municipalities and their officers, agents and employees from liability for damage resulting from negligent supervision. See House Bill No. 6134, § 13 (b) (9), as amended by House Amendment Schedules A, C, D and G, passed by the House on May 1, 1986 (providing immunity from liability arising out of "injury to the person or property of an individual under the supervision of the political subdivision, if it is alleged that such injury was a result of negligent supervision by the political subdivision, provided such supervision did not constitute wilful, wanton or reckless misconduct"). The primary sponsor of the legislation in the House explained the meaning of this provision as follows: "[W]hat it would mean to me is that if two school children are fighting in the hall and one injures the other, that the school teacher who was the hall monitor . . . would not be cited for negligence, would not be in essence, held responsible, or more appropriately, the municipality would not be held liable . . . ." 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5792–93, remarks of Representative Robert G. Jaekle; see also id., pp. 5942–43.

The prospect of teachers and their municipal employers escaping liability when their negligent supervision allowed students to injure themselves or one another raised opposition in the Senate. See, e.g., 29 S. Proc., Pt. 10, 1986 Sess., p. 3501, remarks of Senator Cornelius O'Leary ("No one who has charge of children should be immune from a negligent act, from the consequences of their negligent act. And if you don't think that the fear of a lawsuit compels that teacher to watch the gym class closely, to watch the locker room closely, you are

making a mistake."). Consequently, the Senate rejected the provision providing immunity for negligent supervision, adopting an amendment that eliminated that subdivision. See Senate Amendment Schedule E to Substitute House Bill No. 6134, L.C.O. 3154, as amended by House Amendment Schedules A, C, D and G, passed May 5, 1986; 29 S. Proc., Pt. 10, 1986 Sess., p. 3507. The House subsequently agreed with the Senate, and adopted the Senate amendment. 29 H.R. Proc., Pt. 22, 1986 Sess., p. 8090; see also id., p. 8125, remarks of Representative Robert F. Frankel, debating a different, subsequent proposed amendment ("like the Senate amendment we passed before, we saw the foolishness of providing immunity to school teachers in supervision of children, and we receded from that position"). This rejection of the notion of immunity for teachers and their municipal employers when their negligent supervision allowed students to harm themselves or each other is one of the few clear manifestations of legislative intent that emerges from the murky legislative history of the municipal liability section of the Tort Reform Act of 1986.

The defendants' assertion that § 52-557n (b) (6) establishes a sole proximate causation standard conflicts with this legislative intent. Under such an interpretation, municipalities and their teachers and other employees would have immunity from damages resulting from negligently supervised students injuring themselves or one another, notwithstanding the legislature's rejection of the subdivision providing immunity for negligent supervision. We conclude, therefore, that this interpretation is incorrect.

The defendants have identified a passage in the legislative history that, they assert, exhibits an intention by Representative Jaekle, a key sponsor of the Tort Reform Act of 1986, that § 52-557n (b) (6) would offer immunity to municipalities whenever a third party was partially

to blame for the claimed loss. See 29 H.R. Proc., Pt. 22, 1986 Sess., pp. 8116–18, remarks of Representative Jaekle.[11] This passage, however, does not persuasively support their argument. First, Representative Jaekle's comments did not address § 52-557n (b) (6) specifically. Rather, he addressed subsection (b) in general. Insofar as he did discuss a specific provision, he discussed § 52-557n (b) (8), the provision concerning liability for negligent inspection, which, at the time he spoke, was the subject of a proposed amendment aimed at its removal. Id., pp. 8116–17. Second, other

[11] Representative Jaekle stated: "[A] lot of the exemptions for liability listed are for what I would call third party negligence. That through a variety of rather clever legal means that have built into precedent and become some standards, municipalities have been held responsible and liable for actions of other people.

"Now I don't know all the specifics [regarding a particular negligent inspection lawsuit alluded to by another legislator], but from what I heard, the building inspector didn't build the homes in such a way that they would sink. The building inspector didn't profit from the sale of those units to the people. Now the building inspector, I don't know whether he acted negligently or not. I don't know whether under the facts of those cases, if he never went out there that would be considered such a reckless disregard for the health and safety under all the relevant circumstances because that's how this reads.

"But I do know one thing. It sounded pretty clear to me from the brief fact history, the developer is the one who improperly built those homes. It was the builder that improperly either laid the foundations or prepared the earth, or did the test borings, and he is the one that was responsible for the injuries to that homeowner or several homeowners. . . .

"And in many of these exceptions [enumerated in § 52-557n (b)] that so many people have trouble with, what we are trying to do in many of those cases is say, no, the person who actually caused the injury is responsible. The actions of somebody that is negligent as to an injured party should be responsible. If it's direct negligence on the part of the municipality, and that negligence directly injured somebody, all this concern about municipal liability, you know what? This says the municipality's liable. That's at the very beginning. It says a municipality shall be liable for damages to person or property caused by the negligent acts or omissions of a political subdivision or their employees or officers. And I think that's right, and I think that's proper and I think a municipality should be.

"But you've got to draw the line somewhere, and I think you draw the line at their direct actions and say actions of third parties, the municipality shouldn't be liable for."

statements in the record strongly suggest that Representative Jaekle viewed the exemptions in subsection (b) as a series of discrete exceptions specific to certain situations. See, e.g., 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5930, remarks of Representative Jaekle ("[S]ubsection (b) tries to define *specific* areas of municipal responsibility. . . . And *specifically* it removes that liability from the municipality. . . . And this starts *specifically* listing those types of actions we don't feel municipalities should be held liable for." [Emphasis added.]). Third, particularly in the light of the first two points, his statements in this passage concerning the immunity of municipal defendants from liability for the actions of third parties appear to be an attempt to articulate a common theory uniting what he viewed as discrete, situation-specific exemptions of liability that compose subsection (b), rather than an attempt to explain that one particular subdivision constituted a catch-all provision establishing a standard of sole proximate causation,[12] as the defendants suggest. See, e.g., 29 H.R. Proc., Pt. 22, 1986 Sess., p. 8116, remarks of Representative Jaekle ("*a lot of the exemptions* for liability listed are for what I would call third party negligence" [emphasis added]); id., p. 8117 ("[a]nd *in many of these exceptions* that so many people have trouble with, what we are trying to do *in many of those cases* is say no, the person who actually caused the injury is responsible" [emphasis added]); id., p. 8118 ("I think you draw the line at their direct actions and say actions of third parties the municipality shouldn't be liable for. *And if you don't do it in here or there and we've already cut one out* [the provision granting

_____

[12] Although the possibility that § 52-557n might establish a sole proximate cause requirement was raised as a question by an opponent of the legislation; see 29 H.R. Proc., Pt. 22, 1986 Sess., p. 810, remarks of Representative Michael D. Rybak ("Is there a sole proximate cause escape hatch here for the municipality? I don't think so, but I'm not sure."); the question was never answered by any proponent of the bill.

immunity for negligent supervision] *you haven't done much.*" [Emphasis added.]).

Finally, consideration of the common law concerning the standard of causality in actions against municipalities further buttresses our conclusion that § 52-557n (b) (6) should not be interpreted as the defendants suggest. In general, the common-law rule for causation in tort actions against municipalities is the ordinary proximate causation standard. *Tetro* v. *Stratford,* 189 Conn. 601, 607, 458 A.2d 5 (1983) (rejecting argument that intervening negligence of driver pursued by police required conclusion that there was lack of causation between police negligence and plaintiff's injuries, and confirming that ordinary rules of causation generally apply in action against municipality). According to this standard, "[w]hen there is an intervening force between the defendant's action and the plaintiff's injuries . . . proximate cause [exists when] the defendant's negligence was a substantial factor in causing the plaintiff's injuries and . . . the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." (Internal quotation marks omitted.) *Fleming* v. *Garnett,* 231 Conn. 77, 86, 646 A.2d 1308 (1994); see also *Tetro* v. *Stratford,* supra, 607 ("[a]s a common law proposition, the principles that govern proximate causation . . . do not limit the foreseeable risk attendant to a defendant's negligent conduct to his own acts, but may encompass the acts 'of the plaintiff and of third parties' ").

Thus, if § 52-557n (b) (6) were interpreted as the defendants urge, to establish a standard of sole proximate causation with respect to municipalities and their officers, agents and employees, it would represent a significant change in the law.[13] The legislature may, of

[13] The Waterbury defendants attempt to minimize the magnitude of the change in the common law that would be effected by the adoption of their proffered interpretation of § 52-557n (b) (6) by drawing attention to the sole

course, within constitutional limits, alter the common law by statute. See *Sanzone* v. *Board of Police Commissioners*, supra, 219 Conn. 200; *Gentile* v. *Altermatt*, 169 Conn. 267, 282–94, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). In the interests of "continuity and stability in the legal system"; *Lynn* v. *Haybuster Mfg., Inc.*, 226 Conn. 282, 290, 627 A.2d 1288 (1993); however, this court generally presumes that the legislature, in adopting a statute, did not have the intention to effect a significant change in a fundamental common-law principle. Id. This presumption may be overcome if the legislative intent "is clearly and plainly expressed." Id. As we have already indicated, however, neither the text of § 52-557n (b) nor its legislative history yields a clear and plain expression of any intention to effectuate a significant change. We therefore reject the notion that § 52-557n (b) (6) establishes a sole proximate causation standard.

We next address the defendants' and the trial court's alternative theory regarding § 52-557n (b) (6), namely, that it establishes some other form of heightened causation standard. Specifically, the trial court concluded, and the defendants argue on appeal, that "at a minimum

---

proximate cause requirement that this court has found embodied in General Statutes § 13a-149, providing for municipal liability for defects in roads or bridges. See *Bartram* v. *Sharon*, 71 Conn. 686, 43 A. 143 (1899). This attempt is unpersuasive because the sole proximate cause standard for road and bridge defect liability is only a narrow exception to the normal standard of proximate causation generally applicable to the liability of municipalities and their agents, and is restricted to the statutory context out of which it arises. See id., 695 ("If the language of the statute [waiving municipal immunity for injuries from road defects] had been used in reference to a common-law tort, it might well be claimed that it is broad enough to cover an injury resulting from two combining torts; for in that case the controlling question would be,—has the defendant committed a tort? But the language is not so used; it does not refer to a common-law tort. There is, therefore, no question involved as to the liability of the town for a wrong which cannot be defeated by any concurring wrong; the language is simply defining the conditions of a statutory penalty . . . .").

[the] language [of § 52-557n (b) (6)] mandates that where the acts of a third party are the 'direct' causation of the injury, then the municipality and its agents are immune from liability." Although neither the trial court nor the defendants have explained what exactly, in their view, this standard means, or how it would work, the possible meanings that we can envision are unacceptable.

Because the trial court and the defendants employ the "direct" causation notion without explanation, as if it were an established term in our jurisprudence, we examine our cases for clues as to its meaning. That examination, however, reveals that, in fact, we have never employed a formal "direct causation" standard as a component of our tort law. Moreover, the references that we have made to the concept of "direct cause" in our tort cases, which have consisted of attempts to describe various causation phenomena, are unavailing to the defendants.

The prevalent type of "direct cause" references equates the concept of direct cause with the concept of proximate cause. See, e.g., *Sanders* v. *Officers Club of Connecticut, Inc.*, 196 Conn. 341, 349, 493 A.2d 184 (1985) ("*A proximate cause is a direct cause.* It is an act or a failure to act, followed in its natural sequence by a result without the intervention of any other superseding cause. . . . [It] is thus . . . a substantial factor in producing a result." [Citation omitted; emphasis added.]); *Witkowski* v. *Goldberg*, 115 Conn. 693, 694–97, 163 A. 413 (1932) (using concepts of direct cause and proximate cause interchangeably); *Kinley* v. *Hines*, 106 Conn. 82, 85, 137 A. 9 (1927) (equating direct and proximate cause); *Newsome* v. *Meyer*, 102 Conn. 93, 95, 128 A. 699 (1925) (same); *Walker* v. *New Haven Hotel Co.*, 95 Conn. 231, 237, 111 A. 59 (1920) (approving jury instruction that stated "[t]*he proximate cause is the direct cause*; that cause without which the injury would

not have been suffered" [emphasis added]). Applying this meaning to the defendants' alternative interpretation of § 52-557n (b) (6) would, therefore, render the provision a statutory conferral of immunity for municipalities and their employees, agents and officers, whenever the acts of a third party are a proximate cause of the harm. In other words, that interpretation would incorporate the sole proximate causation standard, which we already have rejected.

A few tort cases have utilized the notion of direct cause in descriptions of causation phenomena in a way that conveys the sense of either the primary causation or the chronologically most immediate causation. See, e.g., *Hammond* v. *Waterbury*, 219 Conn. 569, 576, 594 A.2d 939 (1991); *Kaplan* v. *Merberg Wrecking Corp.*, 152 Conn. 405, 416, 207 A.2d 732 (1965) (describing "direct, immediate cause of the accident" as element of "primary liability," which one tortfeasor must show is attributable to second tortfeasor in order to obtain indemnification); *Pleasure Beach Park Co.* v. *Bridgeport Dredge & Dock Co.*, 116 Conn. 496, 503, 165 A. 691 (1933). We conclude, however, for many of the same reasons that we decline to interpret § 52-557n (b) (6) as establishing a sole proximate causation standard, that this provision should not be interpreted as establishing a causation standard based on either the concept of the primary causation or the concept of the most immediate causation.

First, there is no clear indication in either the language or the legislative history of § 52-557n (b) (6) that the legislature intended either such meaning. Moreover, both a causation standard based on chronological immediacy and one based on relative proportion of causation, like a sole proximate causation rule, would shield municipal defendants from liability in many negligent supervision actions. Either standard, therefore, would conflict with the legislature's clear intent in

enacting the Tort Reform Act of 1986 *not* to provide any additional immunity to municipal defendants from such actions, beyond that provided already by the doctrine of governmental immunity, as we have discussed. Most importantly, reading these concepts into § 52-557n (b) (6) would violate the principle that we generally will not interpret a statute as effecting a change in a fundamental common-law principle—specifically the rule that the ordinary proximate causation standard applies to most tort actions against municipalities; *Tetro* v. *Stratford*, supra, 189 Conn. 601—in the absence of a clear indication of legislative intent to do so. *Lynn* v. *Haybuster Mfg., Inc.*, supra, 226 Conn. 290. Simply put, were we to read either of these concepts into § 52-557n (b) (6), we would be changing fundamental principles of the common law in the name of statutory interpretation, but with no guidance from the statutory language or legislative history as to the shape of the new rule, nor even any clear suggestion that such a rule was intended. This we decline to do.[14] Because the

---

[14] A portion of our analysis in *Sanzone*, in which we concluded that another part of § 52-557n established a new limitation on municipal liability as it existed at common law, may appear to be in tension with our reasoning in the present case. In particular, in a portion of our analysis in that case, we rejected the argument that the principle that we should "strictly construe statutes purporting to limit the common law"; *Sanzone* v. *Board of Police Commissioners*, supra, 219 Conn. 192; militated against our conclusion that the proviso contained in § 52-557n (a) (1) (C) effectively eliminated causes of action against municipalities for damages resulting from a defective road or bridge that existed at common law, leaving only General Statutes § 13a-149 as a means of redress for such an injury. Id. That we declined to apply that principle with respect to one part of § 52-557n, however, does not mean that we should reject it in the present analysis of the part of the statute that we consider today, § 52-557n (b) (6).

It must be remembered that the principle of narrowly construing statutes that purport to change the common law is not an absolute rule, but rather merely an "important [guideline] to the determination of legislative meaning. To permit [it] to displace the conclusions that careful interpretation yields . . . would be a disservice to the legislative process, as well as to the judicial exercise of interpreting legislative language based upon the premise that the legislature intends to enact reasonable public policies." *United Illumi-*

defendants have suggested no further bases for interpreting § 52-557n (b) (6) as establishing a heightened standard of causation, and we can see no principled basis for doing so ourselves, we conclude that that provision does not establish such a standard.

Finally, we address directly the defendants' core contention in regard to § 52-557n (b) (6), namely, the assertion that if that provision is not interpreted as establishing a rule of sole proximate causation, or some other heightened causation standard, it means nothing. We disagree with this assertion. It is true that under the plaintiff's proffered interpretation—that § 52-557n (b) (6) constitutes a codification of the basic common-law notion that municipal defendants, like other defendants, are not liable for the acts of nonemployees or nonagents of the municipality—the provision does not effect a change in the law. The same could be said, however, of any statute that codifies the common law. Yet, we have often recognized that a statute may codify the common law, without concluding that such a construction would render the statute meaningless. See, e.g., *Lieberman* v. *Reliable Refuse Co.*, 212 Conn. 661, 672, 563 A.2d 1013 (1989) (concluding that General Statutes "§ 52-199 codified, but did not [change]" common

*nating Co.* v. *New Haven,* supra, 240 Conn. 455. In *Sanzone,* reliance on the principle would have resulted in the conclusion that the ambiguously worded savings clause in subsection (a) (1) of § 52-557n, "[e]xcept as otherwise provided by law," saved common-law causes of action for damages caused by road defects, notwithstanding the very explicit command of subsection (a) (1) (C), "provided, no cause of action shall be maintained for damages resulting from injury to any person or property by means of a defective road or bridge except pursuant to section 13a-149 . . . ." Under those circumstances, where it was a question of balancing explicit and determinate language in a provision expanding a municipality's immunity against an ambiguous savings clause, the process of careful interpretation properly led to rejection of the principle. See *Sanzone* v. *Board of Police Commissioners,* supra, 219 Conn. 191–92. In contrast, with respect to § 52-557n (b) (6), there simply is no comparably explicit and determinate language purporting to change the common law and, therefore, reliance on the principle is appropriate.

law and constitutional law privilege against self-incrimi-
nation); *State* v. *Blyden*, 165 Conn. 522, 530, 338 A.2d
484 (1973) (concluding that General Statutes [Rev. to
1968] § 53-162 codified common-law offense of escape).
It is also true that the legislature does not usually codify
so basic a notion of the common law as the proposition
that defendants are not liable for the acts of others
who are not their employees or agents. The fact that it
restates a basic notion, however, does not make the
provision meaningless.

We have noted that, as a result of the "complicated
web" of legislative compromises that shaped the Tort
Reform Act of 1986 generally, the section codified at
§ 52-557n consists of a complex interweaving of provi-
sions that codify the common law and provisions that
incorporate new legal notions. See *Sanzone* v. *Board
of Police Commissioners*, supra, 219 Conn. 185. In light
of the foregoing, we conclude that § 52-557n (b) (6)
must be construed as one of the provisions that simply
codify the common law, specifically the basic notion
that municipal defendants are not liable for the acts of
nonemployees or nonagents of the municipality.

Thus, we reject the trial court's conclusion that,
because of the intervening and substantial role of Cook
in causing the death of the plaintiff's decedent, § 52-
557n (b) (6) constitutes a basis for summary judgment
dismissing the nuisance claim against the Waterbury
defendants under count three of the complaint. The
trial court offered no other basis for its summary judg-
ment on that count. Moreover, the Waterbury defen-
dants have not offered us any alternate grounds for
upholding this aspect of the trial court's judgment.[15] We

[15] The Waterbury defendants argued before the trial court for summary
judgment on all counts, including the nuisance claim in count three, on the
alternate bases of: (1) the immunity provision of the Recreational Land Use
Act, namely, General Statutes § 52-557g; and (2) General Statutes § 52-557n
(b) ("a political subdivision of the state or any employee, officer or agent
acting within the scope of his employment or official duties shall not be

therefore reverse the trial court's summary judgment on that count, and remand the case to that court for further proceedings on that count.

We also reject the trial court's conclusion that § 52-557n (b) (6) provided the Waterbury defendants with immunity from the plaintiff's negligence claim under count one of the complaint, and the associated claim pursuant to § 7-465 for indemnification of the individual Waterbury defendants by the city under count two. Finally, we reject the argument of the Morris defendants that § 52-557n (b) (6) provides an alternate basis for affirmance of the court's summary judgment on the nuisance and negligence claims against them under counts five and seven of the complaint. Nevertheless, we uphold the judgment of the trial court on these counts on other grounds.

II

We next consider the trial court's alternate ground for summary judgment in favor of the Waterbury defendants on the negligence claim and the associated claim pursuant to § 7-465 for indemnification of the individual Waterbury defendants by the city under counts one and two of the complaint, namely, that the doctrine of governmental immunity shields them from liability because the conduct complained of constituted governmental acts. The plaintiff claims that this conclusion is improper because the Waterbury defendants were

liable for damages to person or property resulting from: (1) The condition of natural land or unimproved property"). In regard to the first alternate basis, as the trial court noted, our conclusion in *Conway* v. *Wilton*, 238 Conn. 653, 672, 680 A.2d 242 (1996), that municipalities are not landowners within the meaning of the statute, has rendered the immunity provided by § 52-557g inapplicable to municipal defendants. As to the second alternate basis, because the trial court granted summary judgment to the Waterbury defendants on all counts on other grounds, it did not address their claims regarding § 52-557n (b) (1). Because those claims have not been presented to this court, we also do not address them.

involved in proprietary, rather than governmental, actions, namely, the operation of the reservoir. We are not persuaded.

Section 52-557n (a) provides in relevant part: "(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omission of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties; (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit . . . . (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." The plaintiff assumes that these statutory provisions, which were adopted as part of the Tort Reform Act of 1986; Public Acts 1986, No. 86-338, § 13; codify, with no change, the common law regarding the liability of municipalities and their employees for performance of proprietary activities or execution of ministerial acts. With only minor exceptions not relevant to our review in this part of this opinion,[16] the Waterbury defendants agree that "[§] 52-557n has codified the common law of governmental immunity . . . ." Because this question has not been thoroughly briefed or argued before

[16] As we have explained, the Waterbury defendants argue that § 52-557n (b) (6) establishes a sole proximate or "direct" causation standard, a proposition that we have already rejected in part I of this opinion. In addition, they claim that the trial court correctly concluded § 52-557n (a) (1) (B) and (2) (B) "have applied the governmental discretionary immunity to proprietary functions of municipal government," such that, even if the alleged tortious conduct of the Waterbury defendants did arise out of a proprietary function, its discretionary nature provided immunity. Because we conclude that that conduct was not related to any proprietary function, we do not need to review this reasoning, and we express no opinion on it.

us, we also assume, without deciding conclusively, that these provisions have that effect. Even on this assumption, however, the plaintiff cannot prevail.

The plaintiff does not dispute that under the common law, barring the possible application of an exception,[17] both municipalities and their employees or agents have immunity from negligence liability for governmental acts involving the exercise of judgment or discretion. See *Heigl* v. *Board of Education*, 218 Conn. 1, 4–5, 587 A.2d 423 (1991) ("[A] municipality is immune from liability for the performance of governmental acts as distinguished from ministerial acts. . . . Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . [M]inisterial acts are performed in a prescribed manner without the exercise of judgment or discretion . . . ." [Citations omitted; internal quotation marks omitted.]); *Evon* v. *Andrews*, 211 Conn. 501, 505, 559 A.2d 1131 (1989) ("[a] municipal employee . . . has a qualified immunity in the performance of a governmental duty, but he may be liable if he misperforms a ministerial act, as opposed to a discretionary act" [internal quotation marks omitted]). Nor does the plaintiff challenge the trial court's conclusion that the conduct complained of—which essentially consisted of allowing hunting on the watershed land and failing to take certain steps to improve the safety of that activity[18]—required the exercise of judgment or discretion.

---

[17] See, e.g., *Evon* v. *Andrews*, 211 Conn. 501, 505, 559 A.2d 1131 (1989) ("[t]he immunity from liability for the performance of discretionary acts by a municipal employee is subject to three exceptions or circumstances under which liability may attach even though the act was discretionary: first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws . . . and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence" [citations omitted]).

[18] Specifically, the complaint alleged in relevant part: "The injuries and damages hereinafter . . . set forth were caused by the negligence and care-

The plaintiff's claim, rather, is that the alleged conduct did not constitute governmental acts because it concerned a proprietary, as opposed to a public activity,

lessness of the Defendant, City of Waterbury, its agent, servants, or employees in one or more of the following respects in that:

"(a) they knew or should have known that allowing hunting on Waterbury Watershed property was not reasonably safe and posed a risk of injury to members of the general public, including the plaintiff's decedent . . .

"(b) they failed to provide adequate warning signs on Waterbury Watershed property adjacent to Pitch Road to alert members of the general public using Pitch Road that hunting was occurring on the property;

"(c) they failed to adequately supervise and inspect hunting on Waterbury Watershed property;

"(d) they allowed hunting in an area of Waterbury Watershed property which was in close proximity to a public roadway when they knew or should have known it was unsafe and unreasonable . . . to do so;

"(e) they allowed hunting in an area of Waterbury Watershed property which, because of the location of Pitch Road and Morris Reservoir, was inadequate in size to allow hunting;

"(f) they failed to restrict hunting in the area from which the subject bullet was fired although they knew or should have known that it was unsafe and unreasonable not to do so . . .

"(h) they failed to investigate and appreciate complaints, both oral and written, from members of the general public concerning danger created by allowing hunting on Waterbury Watershed property;

"(i) they failed to implement any appropriate policies and procedures to limit the risk of injury to members of the general public including the plaintiff's decedent when they knew or should have known it was unsafe and unreasonable not to do so;

"(j) they failed to appreciate and take appropriate steps to alleviate the dangerous and unsafe condition created by allowing hunting in close proximity to Pitch Road when they knew or should have known it was unsafe and unreasonable not to do so."

In addition to these allegations concerning allowing hunting on the watershed land and failing to take certain steps to improve the safety of that activity, the plaintiff alleged that the Waterbury defendants "(g) . . . failed to obtain the required permit from the State of Connecticut, Department of Health Services, to allow hunting on Waterbury Watershed property contrary to Connecticut General Statutes . . . when they knew or should have known it was unsafe and unreasonable not to do so . . . ." The trial court rejected this particular allegation concluding that "Waterbury has submitted affidavits, not contradicted, that it followed and relied on the requirements of the State Department of Environmental Protection concerning hunting. The plaintiff has failed to cite or refer [to] any health code violation which resulted in injury to [the decedent]." The plaintiff has not challenged this particular conclusion on appeal.

namely, the operation of a water utility. In support of her claim, the plaintiff relies upon three cases involving negligence actions arising out of a municipality's operation of a water utility: *Hourigan* v. *Norwich*, 77 Conn. 358, 59 A. 487 (1904); *Richmond* v. *Norwich*, 96 Conn. 582, 115 A. 11 (1921); and *Abbot* v. *Bristol*, 167 Conn. 143, 355 A.2d 68 (1974). In each of those cases, this court concluded that the municipal defendants could not avail themselves of immunity because the municipalities engaged in the allegedly tortious actions for the sake of corporate gain rather than for the administration of government. We conclude, however, that those cases are inapplicable to the present case.

Unlike the present case, in each of those cases, the allegedly tortious conduct of the municipalities was inextricably linked to the operation of the water utility for corporate gain. In *Hourigan*, the plaintiff's negligence claim arose out of a fatal accident that occurred during the construction of an expansion of the defendant's reservoir. *Hourigan* v. *Norwich*, supra, 77 Conn. 360–62. In *Richmond*, the plaintiff sought recovery for injuries she had suffered when she was shot by a city employee who was hired to guard the reservoir. *Richmond* v. *Norwich*, supra, 96 Conn. 586. Finally, in *Abbot*, the plaintiff landowners sought recovery for diminution of their property value caused by the city water department's construction of a large storage tank on adjoining land. *Abbot* v. *Bristol*, supra, 167 Conn. 150.

In contrast, in the present case, the Waterbury defendants' allegedly tortious conduct—opening the watershed land to hunting, and the manner in which it regulated that activity—is unconnected to its operation of a water utility. Neither the plaintiff in her brief or oral argument, nor our own scrutiny of the evidence in the record, has revealed such a connection. It is apparent, rather, that that activity consisted of a set of policy decisions—which the plaintiff concedes required the

exercise of judgment and discretion—concerning the use of city land for recreational purposes. Moreover, the plaintiff does not allege, and there is no indication in the record, that Waterbury received corporate gain or benefit from the hunting. In these circumstances, we conclude that, as a matter of law, the conduct of which the plaintiff complains constituted governmental, and not proprietary, acts. We, therefore, affirm the trial court's summary judgment in favor of the Waterbury defendants on the negligence claim under count one of the complaint. In light of our conclusion that the individual Waterbury defendants have no negligence liability, the claim for indemnification of the individual defendants by the city with respect to the negligence claim under count two of the complaint necessarily fails. See *Wu* v. *Fairfield*, 204 Conn. 435, 438, 528 A.2d 364 (1987).

## III

Next we consider the plaintiff's claims that the trial court improperly granted summary judgment in favor of the Waterbury defendants on her wanton and reckless conduct claim under count four of the complaint, and her wilful, intentional and malicious conduct claim under count eight of the complaint. The trial court granted summary judgment on these counts on the grounds that, as a matter of law, the plaintiff's submissions of evidence were insufficient to establish the respective causes of action, and the Waterbury defendants argue that that decision was proper. The plaintiff contends that the evidence submitted to the trial court does create a genuine issue of fact in regard to both claims. We agree with the trial court and the Waterbury defendants.[19]

---

[19] The plaintiff asserts, and the Waterbury defendants do not challenge, that a finding that their conduct was reckless, wanton, wilful, intentional or malicious would strip the defendants of the protection of governmental immunity. The plaintiff relies on *Stiebitz* v. *Mahoney*, 144 Conn. 443, 448–49,

Although the plaintiff has brought separate claims for wanton and reckless conduct, on the one hand, and wilful, intentional and malicious conduct, on the other, we review these claims together, under the same standard. Notwithstanding our attempts in the past "to draw definitional distinctions"; *Dubay* v. *Irish*, 207 Conn. 518, 533, 542 A.2d 711 (1988); between these legal concepts, we have recently indicated that, at least in the context of common-law tort actions, these concepts are indistinguishable. Id.

In order to establish that the defendants' conduct was wanton, reckless, wilful, intentional and malicious, the plaintiff must prove, on the part of the defendants, the existence of "a state of consciousness with reference to the consequences of one's acts . . . . [Such conduct] is more than negligence, more than gross negligence. . . . [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Citations omitted; internal quotation marks omitted.) Id., 532–33.

The plaintiff claims that, viewed in the light most favorable to her, the evidence that she offered to rebut the Waterbury defendants' summary judgment motion meets this standard. As summarized by the trial court, that evidence was as follows: there were indications

134 A.2d 71 (1957). Because we affirm the trial court's conclusion that, as a matter of law, the evidence submitted failed to establish such conduct, we need not consider this issue.

that complaints had been received concerning "some hunters on watershed land . . . illegally . . . discharging firearms near residences. No such complaints were received concerning Pitch Road, rather, the complaints [concerned] other areas. One complaint concerned a shot fired over the road of a Wigwam Road resident (in an unnamed town) from the direction of Waterbury Watershed land. The submission also refers to the Watershed supervisor's safety concerns over allowing hunting on lands maintained by his personnel . . . [and his telling] the . . . mayor . . . in 1988 or 1989, and [a] former [a]lderman [at an unspecified time] that hunting should be stopped . . . ." We are unpersuaded.

In light of the fact that the tract was 1800 acres in size and that no municipal ordinance barred hunting on it; in light of the statutory and financial support of this state for maintaining hunting as a recreational activity and wildlife management technique and for encouraging landowners to open their lands to the activity; see General Statutes §§ 26-1 through 26-107, particularly General Statutes § 26-65 (a);[20] and in light of the existence of a state regulatory regime that is designed to regulate, inter alia, hunting safety; see, e.g., General Statutes §§ 26-62, 26-66, 26-71 and 53-203;[21] see also regulations promulgated pursuant to § 26-66; we conclude

---

[20] General Statutes § 26-65 (a) provides: "In the interest of developing a sound wildlife program for all species of wild birds and wild quadrupeds, *to encourage landowner participation in such program and to develop public hunting on public and private lands and waters*, the Commissioner of Environmental Protection is delegated authority to regulate hunting within the state as hereinafter provided." (Emphasis added.)

[21] General Statutes § 26-62 provides: "Hunting accidents; suspension of license or privilege to hunt. Any person who, with any weapon or instrument used in hunting, injures or causes the death of any person, or injures or causes the death of any animal other than a wild animal, or damages the property of another, shall be given a hearing by the commissioner, who may, for cause shown, suspend the hunting license or, if no license is held, the privilege of such person to hunt, for such period of time as the commissioner deems advisable. Any such person may apply to the commis-

that the plaintiff's evidence was insufficient to establish wanton, reckless, wilful, intentional and malicious conduct. Simply stated, given the foregoing considerations,

sioner for the restoration of his hunting privilege and the commissioner shall hear such application and may at his discretion, restore the hunting privilege."

General Statutes § 26-66 provides in relevant part: "Scope of regulations. The commissioner [of environmental protection] may adopt regulations in accordance with the provisions of chapter 54 governing the taking of wildlife, provided any regulations concerning the taking of migratory game birds shall be consistent with section 26-91. The regulations may . . . in the interest of public safety and for the purpose of preventing unreasonable conduct and abuses by hunters, and to provide reasonable control of the actions and behavior of such persons, said commissioner may issue regulations and orders to (12) prohibit the carrying of loaded firearms and hunting within specified distances of buildings, (13) prohibit the discharge of firearms and other hunting devices within specified distances of buildings and, when within specified distances, the discharge of such firearms and devices toward persons, buildings and livestock, (14) prohibit hunting while on any road adjacent to any state park, state forest, premises used for the breeding, rearing or holding in captivity of wildlife or premises used for zoological purposes, (15) establish minimum distances between fixed positions, floating and drift blinds for waterfowl hunting, (16) prohibit crossing over lawns and lands under cultivation, (17) prohibit damage to property, livestock and agricultural crops, (18) prohibit, during specified periods on designated areas, the training, exercising and running of dogs under control or uncontrolled, (19) prohibit the operation and parking of vehicles on designated portions of public and private roads, parking areas, lanes, passageways, rights-of-way, fields and lots, (20) prohibit the discarding of bottles, glass, cans, paper, junk, litter and trash, (21) control the launching, anchoring, mooring, storage and abandonment of boats, trailers and related equipment on properties under the control of the commissioner, (22) specify (A) the persons who shall wear fluorescent orange clothing, (B) the time periods during which such clothing shall be worn and (C) the types and amounts of such clothing which shall be worn, on and after January 1, 1989, when hunting."

General Statutes § 26-71 provides: "Penalty. Any person who violates any provision of sections 26-65 to 26-70, inclusive, or any regulation issued by the commissioner pursuant thereto shall be fined not more than two hundred dollars or be imprisoned not more than sixty days or both."

General Statutes § 53-203 provides: "Unlawful discharge of firearms. Any person who intentionally, negligently or carelessly discharges any firearm in such a manner as to be likely to cause bodily injury or death to persons or domestic animals, or the wanton destruction of property shall be fined not more than two hundred fifty dollars or imprisoned not more than three months or both."

even when the plaintiff's evidence is viewed in the light most favorable to her, that evidence does not provide a basis upon which a trier of fact reasonably could find that the Waterbury defendants' allowing hunting to take place on the watershed land, or any acts they did or failed to do with respect to their administration of that activity, bears the necessary "aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Internal quotation marks omitted.) *Dubay* v. *Irish*, supra, 207 Conn. 533.

## IV

We next consider the plaintiff's claim that the trial court improperly granted summary judgment in favor of the Morris defendants on her negligence claim against them under count five of the complaint. The court concluded that the conduct complained of—essentially, the failure to close Pitch Road to the public, to post warnings, or to stop hunting on the watershed land— involved an exercise of judgment, and that, therefore, in the absence of any applicable exception, governmental immunity shields the Morris defendants from negligence liability. The plaintiff argues that this conclusion was incorrect because in performing the conduct complained of, the Morris defendants were involved in a proprietary activity. We are unpersuaded.

As indicated in part II of this opinion, and for the same reasons, we assume, without deciding, that the governing rules are those established by our common law pertaining to the liability and immunity of municipal defendants. Even on this assumption, the plaintiff's argument is unavailing.

As was true also regarding the negligence count against the Waterbury defendants, the plaintiff does not contest the trial court's conclusion that the conduct of the Morris defendants was discretionary and required

the exercise of judgment, and was, therefore, not ministerial. Once again, however, the plaintiff claims that this conduct was performed pursuant to a proprietary role and is therefore not protected by governmental immunity. The sole evidence cited by the plaintiff in support of this claim—and the only evidence that conceivably could be understood as relating to that claim—are two deposition statements: (1) the statement of the town's first selectman that Morris received payment in lieu of taxes from Waterbury for the watershed property; and (2) the statement of the town highway foreman that Morris plowed Pitch Road after snow storms. As the Morris defendants indicate, "[t]here is no allegation that . . . Morris or its employees owned, maintained, operated or controlled the Waterbury Watershed property." In fact, the plaintiff's amended complaint alleges that Waterbury, not Morris, "owned, maintained and controlled [the] 1800 acre parcel of property which spanned Litchfield, Thomaston, and Morris, hereinafter referred to as Waterbury Watershed property." The plaintiff offers no explanation, nor illuminating evidence, as to how the payment or the plowing, or the two considered together, render Morris' relationship to the reservoir proprietary. Nor has the plaintiff clarified anything about the payment. The purpose of the payment, the nature of the agreement pursuant to which it is made, its amount and frequency—all remain unknown. If any rational inference could be drawn from this evidence regarding Morris' relationship to the reservoir and the watershed property, it is only that that relationship approximates that of any municipality to a taxpaying landowner. Such a relationship, of course, is not proprietary. Therefore, we affirm the trial court's summary judgment in favor of the Morris defendants on the plaintiff's negligence claim under count five of the complaint on the ground that they are shielded from liability by governmental immunity.

## V

Finally, we consider the plaintiff's claim that the trial court improperly granted summary judgment in favor of the Morris defendants regarding the nuisance claim against them under count seven of the complaint. We disagree.

Section 52-557n (a) (1) (C) provides in part that "[e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by . . . acts of the political subdivision which constitute the creation or participation in the creation of a nuisance . . . ." Once again, the plaintiff assumes that this provision, also adopted as part of the Tort Reform Act of 1986; Public Acts 1986, No. 86-338, § 13; codifies, without change, the common law regarding the liability of municipalities and their agents for nuisance. With the exception of their claim that § 52-557n (b) (6) introduces a standard of sole proximate or "direct" causation into the law of municipal liability generally, which we have already considered and rejected, the defendants do not contend otherwise. Because the question of whether this assumption is correct also has not been thoroughly briefed or argued before us, we again assume, without conclusively deciding, that the plaintiff is correct in this regard. Once again, even on this assumption, the plaintiff cannot prevail.

A common-law nuisance claim consists of four core elements: "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages." (Internal quotation marks omitted.) *State* v. *Tippetts-Abbett-McCarthy-Stratton*, 204 Conn. 177, 183, 527 A.2d 688 (1987).

In addition, because the plaintiff's injury was not related "to a right which [the plaintiff] enjoys by reason of [her] ownership of an interest in land"; *Webel* v. *Yale University*, 125 Conn. 515, 525, 7 A.2d 215 (1939); and, therefore, cannot be sustained as a private nuisance, the plaintiff has the additional burden associated with establishing a public nuisance, namely, proving that the nuisance interferes with a right common to the general public. *Higgins* v. *Connecticut Light & Power Co.*, 129 Conn. 606, 611, 30 A.2d 388 (1943). Finally, in order to overcome the governmental immunity of municipal defendants where it applies, the plaintiff must prove that the defendants, by some positive act, intentionally created the conditions alleged to constitute a nuisance. *Keeney* v. *Old Saybrook*, 237 Conn. 135, 165–66, 676 A.2d 795 (1996); *Wright* v. *Brown*, 167 Conn. 464, 470, 356 A.2d 176 (1975) ("[l]iability in nuisance can be imposed on a municipality only if the condition constituting the nuisance was created by the positive act of the municipality"); *Prifty* v. *Waterbury*, 133 Conn. 654, 657, 54 A.2d 260 (1947) ("the rule which exempts municipalities from liability when their employees are acting in discharge of a public duty does not relieve them from liability for the consequences of particular acts which the municipality had directed to be performed and which, from their character or the manner in which they are so ordered to be executed, will . . . create a nuisance"); *Hoffman* v. *Bristol*, 113 Conn. 386, 390–92, 155 A. 499 (1931).

Because in part IV of this opinion we affirm the trial court's conclusion that the Morris defendants are shielded by governmental immunity, the plaintiff is unavoidably confronted with this last requirement. The plaintiff, however, has offered no evidence that reasonably could be viewed as establishing that the Morris defendants, by some positive act, intentionally created the conditions alleged to constitute a nuisance. As the

trial court stated: "Hunting adjacent to the public roadway is the condition alleged to constitute the nuisance. There is no question of fact . . . existing as to whether Morris intentionally created the condition which was the nuisance. The pleadings and the plaintiff's submissions establish that the hunting was being conducted on the Waterbury Watershed adjacent to Pitch Road. There is no showing [that] hunting was allowed by Morris on Pitch Road itself . . . . The extension of the law of nuisance, a liability for maintaining a dangerous condition on one's land, to liability due to adjoining property owners' use of their lands would be an intolerable burden on property ownership. In the absence of control, [a property owner] should not be . . . held to answer for the conduct of another [neighboring] property owner." We therefore affirm the trial court's judgment on this count.

The judgment in favor of the Waterbury defendants on the plaintiff's nuisance claim under count three of the complaint is reversed and the case is remanded for further proceedings in regard to that count; the judgment is affirmed as to the other counts.

In this opinion the other justices concurred.